**Herbert GLATT t/a Magla Products, Plaintiff,**

v.

**G. C. MURPHY COMPANY, a corporation, Defendant.**

**Civ. A. No. 9278.**

United States District Court
D. Maryland.

Nov. 6, 1958.

Thomas W. Y. Clark, Baltimore, Md., Peter J. Gaylor, Elizabeth, N. J., for plaintiff.

J. Crossman Cooper, Jr., and Jacob S. New, Baltimore, Md., Harry Sommers, Newark, N. J., Irving Seidman, New York City, for defendant.

R. DORSEY WATKINS, District Judge.

### Nature of the Action.

This is an action for infringement of Patent No. 2,704,730, issued to plaintiff on March 22, 1955, on an application filed on August 14, 1953, relating to "Semi-Porous Coated Cloth and Articles Made Therefrom." This was a continuation-in-part of an application filed by plaintiff on August 6, 1952, for "Semi-Porous Coated Cloth and Ironing Pad Covers Therefrom." The nominal defendant is G. C. Murphy Corporation, but the suit was admittedly defended by Mapco Corporation, successor to Modernage Aluminum Products Company, the manufacturer of the alleged infringing device. Sale by Mapco to Murphy, and notice of the alleged infringement, were also admitted.

Plaintiff alleges infringement of claims 2 and 4 of the patent, reading as follows:

"2. A ventilated cloth of improved surface smoothness and heat reflectivity comprising a sheet of closely woven textile, a thin, semiporous, heat-reflective, solid, hard-when-dry, non-penetrating organic thermosetting resin coating applied by knife coating substantially uniformly on the top surface only thereof in an amount of about 0.3 to about 1.2 ounces of dry solids per square yard of cloth surface, deposited mainly in the interstices between the weaves of the textile but insufficiently deposited to completely fill said interstices, thereby forming small vent openings in said resin coating in said interstices.

"4. A ventilated cloth according to claim 2 in which the textile is a cotton drill suitable for ironing pad cover use, and the plastic coating comprises substantially a plastic film-forming material stable at temperatures of at least 500° F."

The alleged infringing device is an ironing pad cover. Claims 2 and 4, while obviously sufficiently broad to cover an ironing pad cover, are not limited to such a product. Plaintiff's whole case, however, has been pitched as if such limitation (found in plaintiff's patent 2,570,-110, issued on October 2, 1951, on application filed June 29, 1950; and mentioned as a specific use in plaintiff's patent application of which the patent in suit is a continuation-in-part) were found in said claims. The significance of this will develop in the discussion of the prior art, and alleged prior uses.

### Defenses.

The defendant, G. C. Murphy Company, denies the patent in suit was duly and legally issued; and alleges that the claims in suit are not infringed by the accused device; that the claims in suit are invalid; that the claims are invalid for the reason that such claims are based

on incomplete and indefinite disclosure (contrary to Revised Statute 4888; 35 U.S.C. § 112); that such claims fail to particularly point out and distinctly claim the invention (contrary to R.S. 4888; 35 U.S.C. § 112); that the claims in issue set forth features which involve no more than an obvious use of known materials devoid of any unexpected or unobvious results; that the claims in issue set forth mathematical limitations which are without critical significance; that the said claims set forth features which would be apparent to one skilled in the art, and, therefore, do not rise to the dignity of invention; that the alleged patentee is not in fact the inventor of the subject matter set forth in the claims in issue; that the claims are anticipated by the prior art and prior use; that the claims of the patent in suit fail to incorporate the specific details alleged in the patent to be of critical significance; and that the claims of the said Letters Patent by reason of omission of critical limitations are of a scope broader than the alleged invention set forth in the patent in suit.

In this case, defendant seriously relies upon each and every of what for the most part in patent cases are largely "boiler plate" defenses.

### Development of the Alleged Invention.

Ironing is never done with the goods to be ironed placed directly upon the surface of the ironing board.[1] A pad of some sort is placed upon the board, and in turn this pad is usually covered, and the material to be ironed is placed on this ironing pad cover.

According to plaintiff's testimony, in 1948 and the early part of 1949, plaintiff, a young man of twenty-one, was in a small merchandising business, including the sale of ironing pad covers (often referred to as ironing board covers). Shortly before this, covers with a pyroxylin base had been marketed, but because of their extreme fire hazard they were soon withdrawn. The covers which were most popular then consisted of cotton drill sheets which were drawn over the pad on the ironing board. Ironing of clothes was done directly on such covers. Asbestos covers containing about 20% of cotton yarn binder (to keep together the brittle asbestos fibres) also were marketed by him, as well as some plastic-coated covers which were not commercially successful. These latter covers had a reflective plastic coating and they were relatively impervious to air and water. They will be referred to herein as the "solid" type of plastic coated covers. These latter covers were initially well-received by the purchasing public, but upon use, they encountered ironing difficulties which resulted in numerous complaints which eventually required their removal from the market.

In investigating the reasons for the complaints, Glatt found that the covers were objected to mainly because they were not "heat-resistant". On the basis of this observation, he concluded that if he succeeded in obtaining a heat-resistant coating, he would have a successful commercial product. Accordingly, he proceeded to make inquiries among a large number of coating concerns for a plastic-coated fabric which would not scorch at 500° F. and which would be suitable as an ironing pad cover. Most of these coating concerns submitted samples of their current production, in use for ironing pad covers, to plaintiff which were evaluated by him. All of the samples submitted were of the so-called "solid" coated type which were relatively water and gas impervious and which showed very little, if any, light transmission when put in front of a light.

By the fall of 1949, Glatt selected the coated fabric of Gordon-Lacey Chemical Company as the one offering most promise and he introduced it on the market as his "Magla Silver" ironing pad cover. This cloth was coated on one side with

---

[1] This was and is true, whether or not the old solid wood ironing board is involved, or the more modern metal, and still more recent, perforated metal, board is used.

an impervious thermosetting plastic coating containing a reflective pigment. The cover was accompanied by a circular prepared by plaintiff which advertised as one of its features, the fact that it "will not allow moisture to penetrate through." At that time, plaintiff believed that this property was advantageous.

Initially, sales of this product were good and a number of competitors began selling similar items. Being water-resistant, the cloth also had other uses, such as for tents and tarpaulins. Then, complaints began to come in, the chief one being that the iron stuck or "dragged" when it was slid on the surface during ironing. A sample of the cover was sent to United States Testing Company, and their report of October 13, 1949 confirmed the drag effect on the iron and also noted that the cover did not absorb water, which contributed to the slowing down of drying time of the samples ironed. Anderson of United States Testing Company (which is not a research concern) stated that, at that time, he did not connect the "drag" effect with this property since the iron appeared to stick even in the dry areas, and Glatt similarly testified, stating that he was concerned more with the fact that the plastic surface did not appear to be heat-resistant and that the drag was due to softening or to the soft nature of the coating.[2]

Plaintiff and his competitors undertook to improve the covers. At first, plaintiff, still feeling that the fault was with the coating which was not slippery enough, tried to treat the plastic surface with some material which would reduce the friction of the iron. He noted an article in the "Wall Street Journal" on a high-melting grease which led him to the idea that the application of such a material onto the plastic surface might solve his problem. He was in touch with various manufacturers of such materials and, for a while in 1950, he melted a product known as "Castorwax" into bars which the girls rubbed over the surface of the covers prior to shipment. This treatment appeared to be effective for a short time, but the effectiveness wore off and the drag became as pronounced as before. Those covers which were coated with reflective resin were found to be particularly bad with respect to this trouble of drag.

Thereafter, plaintiff, after studying the "wetting out" effect encountered with ordinary cotton covers, thought that perhaps liquid water was causing the drag rather than the instability of the plastic surface. This led him to the idea of perforating the solid type of coating to vent the water. At first he tried poking a needle numerous times through the coating, but obtained no benefit therefrom. Then, he found out that a John W. Meaker had developed an electronic sparking method for puncturing small holes through sheets, and arranged with Meaker to perforate samples of his solid-coated

2. This report in part stated:
   "However, it was noted that the contact of the iron and the cover caused considerable drag, making ironing quite difficult.
   "It was noted that the ironing board cover did not absorb water. This characteristic greatly slowed the drying of the samples and made the total ironing time longer than using a conventional cover.
   "*Conclusions*
   "On the basis of the foregoing test results, we would not consider the submitted ironing board cover to be satisfactory in its present state because of the tendency for the iron to drag making ironing of small pieces very difficult."

That neither plaintiff nor Anderson associated drag with the presence of water on the surface is somewhat difficult to understand in view of the quoted language. Even more difficult to understand is that in the prosecution of plaintiff's application for a patent on "Ironing Pad Cover," filed June 29, 1950, there appears:
"* * * when a solid ironing surface is employed, there is no means for discharging the steam and drying time is greatly slowed, as is verified by the enclosed report of the United States Testing Company, Inc. (Exhibit A) [the report of October 13, 1949] which points out that 'drag' on the iron under such conditions makes ironing of small pieces very difficult."

cloth, but these, although they showed some pin points when viewed in front of a light, proved ineffective in reducing drag. Finally, he decided to make larger holes by means of a nail punch, and found that the drag effect was reduced by such means. Thereafter, he contacted perforating concerns, and eventually arranged with one of them to perforate his cloth with various size dies and spacings and, upon testing these perforated samples, he found that the drag could be eliminated if the holes were of a certain critical size and spacing. As a result, in the middle of 1950, he developed a mechanically-perforated coated cloth which he sold successfully under the "Magla Silver" label.

Plaintiff obtained Patent 2,570,110, issued October 2, 1951, on application filed June 29, 1950, specifically restricted to "Ironing Pad Covers." [3] The specifications recited the "drag" problem associated with ironing directly on imperviously coated covers. Plaintiff's ironing pad cover was to be coated on the surface with a "water-resistant plastic which is thermally stable at ironing temperatures * * *" This plastic coated cloth was then uniformly perforated with holes of 0.026–0.11 inches in diameter, preferably about 0.055 inches diameter. This would "maintain an overall perforated (open) area of about" 8% on the surface of the pad cover, by which "satisfactory steam discharge is effected therethrough without any embossing effect on the material ironed."

At this time, the only types of plastic-coated material available on the market (other than Glatt's mechanically-perforated cover) were plastic coated pads which required a cotton drill cover during use.

Plaintiff further testified that although success had been reached with the introduction of his mechanically-perforated cover, he soon observed, that, not only was the perforating operation very expensive, but also the perforations tended to fray at the edges and also resulted in embossing of fine clothes ironed thereon,[4] and that the perforation of the cloth weakened it considerably and soon required a heavier base fabric to make it commercially acceptable. Furthermore, the perforated cloth, due to its high cost, was limited to direct selling outlets, and was not in a price range for marketing through department stores. Accordingly, he began to seek ways to improve the cover. He visualized the possibility of knife-coating a cloth with a heat-reflective and -resistant plastic in a manner so as to scrape the plastic on the cloth surface and into the interstices between the weaves, but in a manner so that the interstices would not be completely filled, so that vents would be left for drainage of water and venting of steam. However, he was not sure whether this could be done in such manner that the scraped portions of the cloth would be left scorch-resistant and still enable the cloth to retain openings in the interstices which would adequately drain off the water and vent the steam.

Cooper, of Jewel Sheen Coating Company, who became plaintiff's 99.5% producer under the patent in suit, and who was plaintiff's expert witness, had never made such cloth before. He thought Glatt's idea was completely feasible, and he agreed to coat samples of cloth in the manner outlined by Glatt [5] and to submit various samples to Glatt for evaluation. The first samples submitted proved unsatisfactory, but finally samples were ob-

3. The title of the application, and of the issued patent, is "Ironing Pad Covers." The specifications state:
"The present invention is specifically directed to pad covers only".
The claims were similarly restricted.
The application was assigned to Division 24, a subdivision of coated materials.

4 Compare this with the statements in the specifications of No. 2,570,110, in the sec-

ond preceding paragraph of this opinion—"without any embossing effect on the material ironed." (Emphasis supplied.)

5. Just what plaintiff did tell his coater will have to be considered in substantial detail, but more appropriately in connection with a consideration of the prior art, and on the question of whether or not plaintiff was the true inventor.

tained which Glatt's testing showed to be scorch-resistant and also free of drag. The amount of coating applied was claimed by Glatt to be critical, and the optimum dry coating weights were found by him to be 0.5 to 1.0 ounce per square yard of cloth. He further determined that if the coating weight fell below 0.3 ounce per square yard, the cloth began to become scorched by the iron in the ironing operation. Also, if the coating weight exceeded about 1.2 ounces per square yard, a drag began to be observed on the iron.

The cloth was used in making the "Magla Silicone" covers which Cooper said were "fabulously" successful. Glatt testified that in the brief six-year period of 1952–57, he sold almost 9¼ million of such covers at a retail price of $14 million. Cooper stated that when Glatt placed his "Magla Silicone" covers on the market, he became swamped with at least twenty telephone calls from manufacturers asking him to coat such cloth for them.

The "Magla Silicone" cloth had no other use than for ironing pad covers.

However, the vented or porous covers did not supersede the perforated one, and the success of the vented cover must be attributed in part to substantial advertising. Over the period 1952 to 1957, some $678,000 was spent on such advertising; $179,000 in 1954 and 1955;

$182,000 in 1955 and 1956, and $200,000 in 1956 and 1957.

Plaintiff testified that the people who use the perforated cover "are happy with it, but the buying has leveled off" to retail sales of about $1,000,000 a year,[6] involving no advertising expense to plaintiff. Moreover, asbestos and cotton covers are still being sold, as are non-pervious covers;[7] (untreated covers outselling treated ones by about five to one.)

### Validity.

Plaintiff testified that by the summer of 1951 he "had a good knowledge of ironing board [sic] covers, and I knew that there were certain basic requirements that were essential for good ironing board [sic] covers * * *" These were (a) heat resistance; (b) heat reflectivity; (c) porosity, to allow the penetration of water and steam; and (d) the back of the fabric should be absorbent to allow the absorption of water, while the ironing surface should be smooth and nonabsorbent. He further testified that he thought that if the plastic could be scraped across the fabric, putting most of the plastic into the interstices, some "open air could go through the interstices, but that there would be enough plastic still on the surface to protect the cotton from scorching."

Plaintiff admitted that, prior to his patent, heat-resistant material was used

6. The following figures were given:

|  | Perforated | Porous | Advertising Porous |
|---|---|---|---|
| 1951 | $ 135,000 | — | — |
| 1952 | 260,000 | $ 208,000 | $ 8,100 |
| 1953 | 780,000 | 402,400 | 34,000 |
| 1954 | 1,000,000 | 960,000 | 75,000 |
| 1955 | 1,000,000 | 1,440,000 | 179,000 |
| 1956 | 1,000,000 | 1,600,000 | 182,000 |
| 1957 | 1,000,000 | 1,840,000 | 200,000 |

Plaintiff testified that the retail sales figure for the porous covers should be divided by three to obtain plaintiff's price.

———◆———

7. Whether the non-pervious covers were ironing *board* covers, requiring the use of some sort of an additional cover, was not entirely clear, but the very strong inference was that this was the case.

on ironing board covers; heat-reflective material was available for such use; material was available for use on ironing boards where the back of the fabric was absorbent; but he knew of no material then in use, suitable for ironing board covers, that contained porosity.[8]

Plaintiff had not, before July 1951, had any patent search made of coated fabrics, particularly ventilated and porous fabrics; and had no knowledge that porous ventilated fabrics had been made before August, 1952.

It is against this background that an examination must be made of the prior art. Although the claims in suit are not limited to ironing pad covers, special attention will be paid to this aspect.

### Prior Patents.

Cited in the file of No. 2,704,730, the patent on suit, are the following United States Patents:

| Number | Patentee | Application Date | Patent Date |
|---|---|---|---|
| 2,066,079 | Shoub (Textile Fabric and its Method of Manufacture) | Feb. 19, 1935 | Dec. 29, 1936 |
| 2,176,053 | Billing (Sizing Textile Fabric) | Sept. 9, 1936 | Oct. 17, 1939 |
| 2,196,655 | Borghetty (Apparatus for Treating Fabrics) | Oct. 4, 1937 | April 9, 1940 |
| 2,213,883 | Lurie (Rubberized Fabric) | Nov. 13, 1936 | Sept. 3, 1940 |
| 2,405,703 | Mackechnie (Process for Treating and Composition for Cover Cloth) | March 22, 1945 | Aug. 13, 1946 |
| 2,575,577 | Beauchamp (Waterproofed Fabric and Method of Producing It) | Oct. 31, 1946 | Nov. 20, 1951 |
| 2,630,620 | Rand (Coated Fabric) | Sept. 29, 1952 | March 10, 1953 |
| 2,673,824 | Biefeld | Aug. 26, 1949 | March 30, 1954 |

Shoub, who sought to eliminate starching by the application of a minutely thin layer of thermoplastic vinyl type resins, by spraying or dipping, leaving the qualities of the fabric unaffected except for stiffness, is in no respect anticipatory.

Billing also was concerned with producing a permanently sized textile fabric suitable for articles of wearing apparel customarily starched, which after laundering and pressing would have starched appearance. His patent called for "bonding adjacent threads together, but not forming a continuous coating on the individual threads, or filling the interstices between the threads. * * * "[9] "* * * sufficient to impregnate the individual threads of the fabric and to

8. "Porous" must in this context mean a cloth porous after coating, as distinguished from a perforated cloth, such as that in plaintiff's patent 2,570,110.

9. Column 1, lines 31–35.

substantially bond the threads together where directly adjacent, but insufficient to fill the interstices between the threads or to form a continuous coating over the surface of the textile."[10]  The fabric was to be impregnated with an aqueous emulsion of a solution of a solid, thermoplastic, film forming material, removing the excess solution as by passing the cloth between padded rolls and pressing at a temperature of about 320°F.  When using a material which softened at 400°F. or above, a plasticizer would desirably be added.

"The amount of the dry thermoplastic composition remaining in the fabric will ordinarily be within the range of about 5% to about 40% by weight of the untreated cloth."[11]  Defendant's expert testified that this represented a lower range of 0.075 – 0.3 ounces per square yard, and a top range of 0.6 – 2.4 ounces per square yard.[12]

All nine of the claims conclude "without the interstices being filled by" the particular sizing material.

While Billing teaches leaving the interstices open, all exposed portions of the fabric are impregnated; and the recommended impregnating material is thermoplastic, not thermosetting.

Borghetty was concerned with an apparatus for applying coverings to threads to prevent slipping and fraying.  Penetration of the covering material could be limited to substantially the surface of the threads.

If the inventor was concerned at all with porosity, it was with the maintenance of original porosity.  Penetration of the surface of the threads would be effected on all exposed sides.[13]

Lurie sought to produce a rubberized fabric composed at least in part of soft twisted threads, in which "a major portion of the individual fibers comprising said soft twisted threads are individually rubber coated in such a manner as to preserve substantially all of the natural interstices between said fibers * * *."  The fabric was to be impregnated, the excess rubber coating squeezed out, and the product dried and vulcanized.  "The individual rubber coating of the individual fibers of the threads preserves the natural interstices between the threads themselves and also preserves the natural interstices between the individual fibers making up the threads * * *."  The fabric so produced could be "most successfully used as lining material for garments, neckties, and other similar purposes * * *."

The invention sought to preserve original porosity.  Insofar as it successfully impregnated the individual fibers, it left no absorptive surface.  The amount of coating deposited would seem to be well above the upper range in the patent in suit.

Mackechnie, while concerned with the art of fabric treatment, claimed more particularly "the production of an improved cover cloth for a hot ironing press such as is commonly used in laundries and clothes pressing establishments."  This cover cloth is "the outside covering of the padded member between which and the heated member the garment is pressed in the usual power operated ironing machine."[14]  Heat, pressure and steam subject such covers to severe destructive action, the life of an ordinary woven cover being about two and one-half working days.  Mackechnie claimed his process would double the life of a woolen cover, and would permit the use of cheaper cotton covers, which would be three to four times more durable than woolen covers.

The invention calls for the impregnation of the fabric with a mixture of linseed oil, egg white and a relatively small quantity of synthetic resin.  "The com-

10.  Column 2, lines 5–10.

11.  Column 2, lines 10–14.

12.  Based upon the range of drill fabrics of 1.5 to 6 ounces per square yard.

13.  If a cylindrical body can be said to have sides; a problem of nomenclature repeatedly presented in applying the art to threaded material.

14.  An ironing pad cover.

position is applied to the fabric in a manner and in such quantity as not to completely close the pores of said fabric or to form an air tight skin film thereon. The impregnation serves rather to coat the individual fibers or strands leaving the completed fabric in slight degree porous but water repellant."[15] "When dry it should not clog said pores or form an impervious skin on the fabric. It will be found that when the fabric is so treated it becomes more or less water repellant although not absolutely water proof."[16]

The testimony indicated that impregnation would represent a weight gain of 36.5 − 52.6%, and that it occasioned no usual substantial change in porosity.[17]

Beauchamp relates to "water-impermeable, water-vapor-permeable fabrics having a coating of polydiene rubber;" "capable of excluding liquid water under substantial hydrostatic pressures and yet which are quite pervious to gases, and especially to water vapor." The coating compositions are compounded with large proportions of a hydrophilic diatomaceous earth, together with rubber, or resins such as polyvinyl acetals, including polyvinyl butyral.

Well-known apparatus and methods could be used for "impregnating or coating the fabrics."

"The preferred method of applying the coatings involves the 'spreading' technique, in which cloth is drawn tightly over a series of rolls or other devices and the compounded latex or solvent dispersion is applied using a doctor blade or other straight edge to control the thickness. The blade may be set up perpendicularly to the fabric or at an angle so as to force the coating composition into the interstices. Frequently it is desirable to apply several successive layers, allowing each to dry wholly or partially before applying the next layer. The first layer is sometimes applied with the spreader knife set at zero clearance so that only the interstices are filled on the first application, the desired covering layers being put on subsequently by separate spreading operations."

Claims 1 and 2 refer to a fabric coated with a continuous layer; claim 3 [18] to the method of preparing the fabric by applying a continuous layer.

The knife coating process obviously, and admittedly,[19] would coat one side only, leaving the other absorbent.

---

15. Column 2, line 53.
    Column 3, line 4.

16. Column 3, lines 24 to 28.

17. At the trial, an expert, in the field of polymers and plastics, but not in the field of laundry ironing pad covers, testified for plaintiff that the night before he had tried to follow the patent teachings of Mackechnie in the application of the mixture to cloths and then rested a *dry* iron on *dry* treated and untreated cloths for approximately twenty seconds at 450 degrees Fahrenheit, at the end of which time "the *discoloration* on the coated cloth was far greater than the *discoloration* on the uncoated cloth." He did not subject the treated cloth to a steam test. He further testified that the liquid penetrated the pores of the fabric although he tried to apply it to one side only. (All emphasis supplied.)

Plaintiff also offered in evidence a telegram from the American Institute of Laundering:

"We have no knowledge of any present covers containing egg white, linseed oil, petroleum spirits, or ester gum being used in commercial laundries in past ten years. Nylon covers now in most general use by industry."

18. Column 3, lines 37 to 53.

19. One of plaintiff's chief witnesses agreed that this coating would leave the cloth coated on one side, with absorbent qualities on the other; that "Raincoat material is normally made in that manner."

The Beauchamp patent refers to the use of the coated fabric in the fabrication of wearing apparel, tents, sleeping bags, hospital sheetings and furniture coverings.

Plaintiff's said witness thought the very limited porosity to vapor, and no porosity to water, would make the Beauchamp product an unsatisfactory ironing board cover.

Defendant's expert testified that the rate of moisture vapor transmission was "almost a substantial equivalent of the moisture transmission of the Glatt fabric * * *."

Rand claimed a textile fabric bearing a thin superficial application of heat reflective material "sufficiently porous to allow breathing or passage of the water vapor." This was to be accomplished by spraying on one side a reflective coating of near microscopic or microscopic metallic flakes forming a foliated layer, held on the fabric surface by an organic binder. In such application the interstices created by the crossing of the threads would remain open to leave the porosity of the fabric substantially unimpaired. The increase in resistance to the passage of a stream of air should not exceed 10% if the fabric is properly coated. The additional weight would normally be almost insignificant.

Except for heat reflectivity and porosity, there is little resemblance to plaintiff's patent, where the coating is to be deposited mainly in the interstices; in Rand the weight of the coating, applied by spraying, is insignificant, while in Glatt it is 0.3 – 1.2 ounces per square yard; in Rand the porosity of the cloth is 90%, while in Glatt porosity is in the order of 5 to 15%, and knife coating is used.

Biefeld dealt with the process for manufacturing vapor permeable, fluid or water repellant fabrics, such as would find excellent use for tarpaulins, awnings, and other structural and insulation items; its leather-like characteristics making it adaptable for use in the manufacture of wearing apparel, luggage, purses, upholstery, bookbinding, and the like. "Volumetrically, the final product is constituted of about 20 to 65 per cent voids with the remaining solids being present in the ratio of about twenty parts by volume of glass fibers to 5 – 50 parts by volume of" a high polymeric substance.

## Procedure in Patent Office.

Application 302,947 filed by plaintiff on August 6, 1952 was for "Semi-Porous Coated Cloth and Ironing Pad Covers Therefrom." It recited the alleged [20] gradual replacement of ordinary cotton or asbestos ironing pad covers by plastic coated covers "which are coated with a heat resistant and usually heat-reflective coating." Impervious plastic coating prevented the venting of steam, creating a drag and a tending to leave the ironed clothes somewhat damp. It was claimed these defects were in part overcome by mechanical perforation as in plaintiff's Patent 2,570,110. However, this product was expensive, the perforations tended to weaken and ravel, and there was some embossing of very light weight fabrics. The present invention involved the coating on one side of a fabric with a thin semi-porous film of heat resistant plastic, the porosity being only sufficient to vent steam and the covering sufficient to protect the fabric. It recited that heat resistant film-forming plastics were well-known and in common use, most types being based on thermosetting resins, such as polyvinyl butyral resin cross-linked with a heat-setting resin to provide adequate thermosetting qualities. Two allegedly suitable compositions were given (which are incorporated in the specifications of the patent as issued). It is stated that "the plastic composition can be applied to the cloth by roller printing application. However, the preferred means is by knife coating * * *." A satisfactory semi-porous coated cloth results from a uniform coating of 0.7 to 1.4 ounces of dry solids per square yard of cloth treated. A light coating of silicone polymer is advantageous. A porosity "believed to be in the neighborhood of about 5 – 15% (mainly between the weaves)" is obtained, i. e. about 5 – 15% of the total linear surface area of the cloth is in the form of pores. Ordinary coated cloth is coated with at least about

---

20. See page 55 of 168 F.Supp., supra, that at the time of trial, asbestos and cotton ironing pad covers were still on the mar-

ket, and untreated covers were outselling treated by about five to one.

three or even five or more times the amount of solids, to eliminate porosity.

The application recites tests of effectiveness using cotton drill coated with a heat stable polyvinyl butyral resin (example 2), containing 8.16% aluminum powder pigment "together with a light silicone coating."

All seven claims were for an ironing pad cover, or a cloth suitable for ironing pad covers,[21] with a thin semi-porous coating of heat stable plastic deposited uniformly thereon; with variations as to ranges of solids; and the use of thermosetting polyvinyl butyral plastic, with polysilicone and metal pigment. These were rejected on Holroyd[22] which disclosed "a porous ironing pad cover coated with polyvinyl butyral resin," with the removal of the excess. Other patents[23] and Rand disclosed a textile base coated with a silicone resin to impart heat resistant characteristics thereto.

The claims were withdrawn, and three new ones were submitted. All claimed "a cloth, suitable for ironing pad covers." In addition, claim 8 covered a "thin semi-porous, reflective pigmented coating of a plastic, stable at temperatures of at least 500°F., deposited uniformly thereon in an amount of 0.7 to 1.4 ounces of dry solids per square yard of cloth." Claim 9 was for a cloth, according to claim 8 in which the coating contains 6% to 10% by weight of a metal reflective pigment; and claim 10 was for a cloth according to claim 8 in which a thin film of polysilicone is disposed over the plastic coating.

The remarks in support of the new claims spoke only from the viewpoint of ironing. The Examiner on March 3, 1955, rejected claims 8 and 9 "as unpatentable over the allowed claims 2 and 4 in applicant's application Serial No. 374,199, filed August 14, 1953.

"Claim 10 is rejected as unpatentable over the allowed claims of applicant's application, noted above, especially in view of Swiss, Underwood and Rand. Each of the secondary references discloses a textile base coated with a silicone resin to impart heat resistant characteristics thereto. Overcoating the coated fabric of applicant's claims with a silicone resin would not amount to invention, since no new nor unexpected results are produced thereby."

The specifications of application 374,-199 (on which the patent in suit issued) are largely verbatim those of application 302,947 just discussed, with certain significant differences. First, the subject matter was now titled as "Semi-Porous Coated Cloth and Articles Made Therefrom"—an expansion practically ignored in the prosecution in the Patent Office, and by plaintiff in the trial of this case.

---

21. Note subsequent verbal changes.

22. 2,534,818, December 19, 1950—a most significant patent. It was cited by Examiner Arnold in Application 302,947, and in part formed the basis for rejection of all the original claims. The further prosecution of this application, and the entire prosecution of Application 374,199, was before Examiner Navius, who did not cite or refer to Holroyd, and did not include it among the references cited of record at the end of the patent.

Apparently R. S. Kendall was the Primary Examiner on both applications. Under the holdings in Otto v. Koppers Company, 4 Cir., 1957, 246 F.2d 789, 801; Gibbs v. Montgomery Ward & Co., D.C.D.Md.1928, 19 F.2d 613, 616, affirmed without discussion of this point, 4 Cir., 1928, 27 F.2d 466, this would constitute a citation of the patent. A full discussion of the disclosures in Holroyd, and the failure of Examiner Nevius to notice them, much less appreciate their weight, might properly be in order. However, plaintiff took the position that as Holroyd was not in the references cited of record, and had not been included in the list in defendant's notice under U.S.C. Title 35, section 282, its use was restricted to showing the state of the prior art, and it could not be considered as anticipation or to invalidate claims. Defendant apparently agreed. The court has accordingly similarly limited its use of this patent. If it were available on the broader basis, it would further strengthen the court's conclusion of invalidity.

23. Swiss, 2,595,729, May 6, 1952, and Underwood, 2,611,727, September 23, 1952.

Second, the specifications refer to the preparation of porous cloth in the past in which the coating material is sprayed over the fibers in a manner to deposit the coating on top of the fibers, while in the present invention most of the material is deposited in the interstices, "which are, generally, not completely filled with solid plastic, but only partially filled," and wherein the small vents are still maintained. Such coating cannot be obtained by spraying, but by knife coating. "Roller coating or printing do not accomplish this effect." [24] Third, the coated cloth may be used in the interliner field, the lining material usually being closely woven rayon cloth, particularly rayon satin, to which "the plastic coating containing the reflective pigment is applied by friction spreading as already outlined" to one side. In such case it is not necessary "to employ a heat-resistant plastic for the coating, and most hardenable or hard-when-dry plastic materials would be suitable." The application of about 0.3 to 0.9 ounce per square yard improves the "hand" (or feel) of the liner, "whereas there is still sufficient porosity to effect adequate ventilation within the garment to prevent un-necessary perspiration ordinarily caused by humidity increase within the enclosed area."

The seven claims related to a ventilated cloth of improved surface smoothness and heat reflectivity, comprising a sheet of closely woven textile, a thin semi-porous plastic coating disposed substantially uniformly in an amount of about 0.3 to about 1.2 ounces of dry solids per square yard of cloth surface, mainly deposited in the interstices; with variations as to the inclusion of a heat-reflective pigment; suitability for ironing pad cover use and interliner for clothing; and means defining "randomly scattered pin point vents disposed within said deposited plastic."

A petition was filed to make special on the ground that plaintiff had been marketing ironing pad [25] covers in accordance with the application and that an infringing cover was being marketed containing a coating of semi-porous plastic uniformly applied on the surface of the cloth, the plastic coating being deposited mainly in the interstices.

The Examiner cited Shoub, Billing, Borghetty, Lurie, Mackechnie and Rand, and disallowed all claims. [26]

24. Compare this with application 302,947, where it is stated that "The plastic composition can be applied to the cloth by roller printing application." Note also, that the tests with, and results from cloth treated with Example 2, plus aluminum power pigment and a light silicone coating, are word for word those in application 374,199.

25. It is interesting, and indeed remarkable, that although in the patent application and patent in suit, and in the trial, it is emphasized that plaintiff's patent relates to an ironing *pad* cover, and on that basis much of the prior art (including an alleged infringing device on which plaintiff's application was sought to be, and ultimately was, made special), was sought to be distinguished, plaintiff's patented product insofar as it related to ironing is sold as an ironing *board* cover. (Plaintiff's Exhibit 2). A label is affixed to the cover stating that: "This is a genuine Magla Ironing Board Cover", with reference to "U. S. Patent No. 2,704,730." The cellophane envelope for the cover contains the words: "Magla Silicone Ironing Board Cover"; "Produced under U. S. Patent No. 2,704,730."

26. "Claims 1–8 are rejected as unpatentable over any of the patents cited above which disclose coating a fabric with plastic coatings so that the fabric remains porous. Rand, Shoub and Lurie especially disclose solids included in the coating compositions. Since the references clearly disclose a porous coating, the limitation as to the weight of coating material does not confer patentability on the claims.

"Claims 1–8 are further rejected as failing to properly define the invention. The claims are too broad in 'plastic coating' since it is not obvious nor has applicant disclosed that all plastic coatings are operative for his purpose. For instance, would asphalt, glass or wax be suitable? Claim 3 is improper since it includes method limitations. The article should be defined by its own physical characterics [sic] not by the method in which it was made.

"Claims 1–8 are further rejected as vague and indefinite in 'means * * *

The claims were then amended to define the plastic coating as "solid, dry, organic, thermosetting" to be "applied by friction spreading" deposited on the "top surface." The cited art was attempted to be distinguished in that it would result in embossing in ironing, or presenting "a rough surface to the hand in interliners," or involved impregnation. Reference was made to the prompt appearance of copiers.

Again, the Examiner, citing Beauchamp and Biefeld, after conference, refused to allow any claims.[27]

Thereafter, a further amendment was filed, restricting the claims to a coating "applied by knife coating." Beauchamp is attempted to be distinguished as a continuous coating; Patnode does not protect the cloth; Biefeld 2,673,823 and 2,673,825 [28] would not vent steam formed during ironing. These teachings, it is claimed, would render the fabric unsuitable for ironing (their significance in garment lining being ignored). The supporting affidavit likewise is restricted to ironing aspects.

Thereupon, the patent issued. Apparently, the Examiner was persuaded by the argument that the cited patents, although disclosing coating on one side only and the maintenance of interstitial openings, primarily involved impregnation, with either no deposit in the interstices, or an effort substantially to close all interstices. Presumably, he was persuaded that these disclosures did not anticipate plaintiff's claims with respect to ironing board covers (or ironing board pads—see footnote 25)—despite the fact that the title, specifications, and claims were not limited to covers for ironing board pads (No. 2,570,110) or ironing board covers; but were for "Semi-Porous Coated Cloths and Articles Made Therefrom."

Not cited as references in the patent as issued, in addition to several patents [29] that add little to those cited are:

---

defining pin point vents.' Applicant appears to be either claiming the vents per se which is improper or to be reclaiming the plastic material, a double inclusion and also improper."

27. "Claims 4, 5, 7, 8, 9 and 10 are rejected as unpatentable over Beauchamp in view of Biefeld. The primary reference discloses applying a plastic coating to a woven textile base by means of a doctor knife. The coating provides small vent openings so that the coated fabric is pervious to water vapor. Also the coating is deposited mainly in the interstices of the fabric, see Column 3, lines 48–53. Biefeld discloses a similar process with the use of a thermosetting resin. To substitute the thermosetting resin of Biefeld for the thermoplastic resins of Beauchamp would not amount to invention since the advantages and disadvantages of these two types of resins are well known in the art. Especially as regards heat resistance. The solids content of the plastic coatings per square yard of cloth surface does not render these claims patentable. The thickness of the coating is a matter of choice and desired results and *it is within the skill of the art to vary the amount of coating material applied to the fabric to obtain a desired result whether it be*

*of flexibility, opaqueness, porosity* or feel. (Emphasis supplied).

"Claim 2 is rejected over the references and for the reasons set forth above in the rejection of claims 4, 5, 7, 8, 9 and 10, especially in view of Rand. This patent discloses the use of reflective pigment in a thermosetting binder for coating a textile fabric. To employ a reflective pigment in the coating of the primary reference would not amount to invention since no new nor unexpected results are produced thereby."

28. All relating to a water-impermeable, water-vapor permeable textile product.

29. Goodyear, No. 25,192, August 23, 1859 "Improvement in Porous-napped Rubber Fabrics"—coating on one face, applied by "spreading knife" to produce a fabric pervious to air and impervious to liquids. It is questionable if a smooth surface would result; and the fabric, useful "as clothing," would not withstand ironing temperatures.

Cavanaugh, No. 1,510,654, issued on October 7, 1924, on application filed November 22, 1919, for Ornamenting and Proofing Fabrics, disclosed a moistening to impregnate fibers to act as a temporary filler to exclude at least partially the penetration of the finishing filler into

Rodman, No. 2,404,313, issued July 16, 1946, on application filed January 9, 1943, for Coated Fabric, related to coated compositions, and particularly plasticized vinyl resins, suitable for spreading on textile fabrics, applied by "means well known in the coating art such as, e. g., spray coating, roller coating, doctor knife coating and by passing the fabric through the composition and pressing out the excess coating composition. The fabric may be coated on one or both sides depending upon the use for which the material is intended." A coating of 3 – 4 ounces per square yard of polyvinyl-alcohol butyraldehyde resin for raincoats was disclosed.

Rodman, No. 2,423,565, issued July 8, 1947, on application filed September 24, 1942, for Polyvinyl Acetal Resin Compositions, sought a process of treating polyvinyl acetal resins to render them heat resistant through cross-linking. Two coats were applied to one side of the fabric, which was passed through heated calender rolls under heavy pressure "to flatten and close any pinholes in the coating." The amount of composition applied, generally in the range of 3 – 6 ounces per square yard for raincoats, could "vary over a wide range, and will be largely governed by the weight and type of base material being treated, as well as by the particular use for which the finished product is intended."

Spessard, No. 2,427,513, issued September 16, 1947, on application filed March 3, 1944, for "Process for Dispersing Copolymer of Vinyl Chloride in a Ketone and Hydrocarbon Dispersant", provided for coating cloth with the compositions "by spreader or knife-coating methods," the weight of the coating being "varied from 2 to 7 ounces per square yard, as an example, and this film thickness may be built up either in single or multiple coats." The specifications further recited that "Instead of coating cloth with a continuous film, cloth or other porous material may be lightly impregnated with the solution without eliminating the porosity of the cloth."

Plaintiff was not one skilled in the art, and was unfamiliar with prior patents in the coating field. Presumably the Examiner was skilled in the art. In the patents cited of record in the issued patent, and in the additional patents discussed above, the knife-coating of a fabric on one side, with a heat-resistant, heat-reflective, porous plastic coating, with an uncoated and absorbent back [30], the weight of the coating or coatings being dependent upon the basic fabric, and the end use, were fully disclosed. Perhaps the adaptability of such disclosures to ironing pad covers was not clearly obvious. But plaintiff, contrary to his Patent No. 2,570,110, did not limit his invention to ironing board or ironing

the interior fibers (which would seem to be surface coating). The finishing prepparation, a liquid carrier or binding medium containing a metallic or bronze powder, would then be sprayed over the fabric "or it may be flowed lightly over the fabric and then scraped off with a knife leaving sufficient adhering to the fiber of the fabric to give the desired effect." The inventor was primarily seeking ornamentation and soil-proofing. The disclosed binder would not have been heat stable, or suitable for ironing board pad covers.

Patnode, No. 2,306,222, issued on December 22, 1942 on application filed November 16, 1940, on Method of Rendering Materials Water Repellant, sought to produce water-repellant materials by treating normally water-wetted materials with an organo-silicon halide in vapor form. The coating so obtained "not only

is invisible to the naked eye but cannot be seen even under a high-powered microscope, and, in general, is so thin as to be practically impossible to weigh." "Flexible porous sheet materials such as cotton cloth, etc., which are treated as herein described, acquire the power to shed water while at the same time retaining sufficient porosity that gases at normal pressures can pass therethrough." The method of exposure to vapor is not disclosed but presumably the material would be exposed, and treated, on all sides.

Lawrence, No. 2,517,218 issued August 1, 1950, on application filed March 23, 1946, for Polyvinyl Butyral Composition, taught the use of various fillers such as hydrated alumina.

30. Plaintiff's 2,570,110 also specifically referred to the absorbent back.

pad covers; and his claim 4 herein merely claims that the cloth is "suitable for ironing pad cover use." Had plaintiff restricted his patent to ironing pad covers, the question of validity might be a difficult one. However, plaintiff having sought to expand his claim beyond the possible elements of novelty discovered by him, must lose by his cupidity. The Examiner, apparently diverted by the emphasis on the ironing pad cover[31], overlooked the breadth of the disclosures and claims; and despite the prima facie validity of the patent and the burden upon the party attacking it (U.S.C., Title 35, section 282; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 434, 31 S.Ct. 444, 55 L.Ed. 527; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 564; Otto v. Koppers Company, 4 Cir., 1957, 246 F.2d 789, 800–801), the court is constrained to hold the patent void as lacking in novelty and invention over the cited prior art (even excluding Holroyd).

State of Art apart from Cited Patents—Prior Use and Knowledge.

When the art, apart from the patents cited as references in the patent in suit, and those cited by defendant pursuant to the requirements of U.S.C.A., Title 35, Sec. 282, is considered, lack of inventive novelty is even clearer.

The evidence established, without challenge, that knife-coating was old in the art[32]; that there was no problem in knife-coating to push substantially all of the coating into the interstices of the cloth being coated; and that the real problem was not the production of a *ventilated* cloth, *but* to produce a *nonpervious* cloth.

The nature of the cloth to be coated, the viscosity of the coating, the kind, and setting, of the knife blade, the heat in the chamber, calendering, all would combine to determine the way in which a coating would be deposited, and how the cloth would be coated when dry. The knife could be selected and adjusted to spread the coating on the fabric, or into the interstices. Usually two or more coatings were necessary to prevent ventilation in the coated cloth.

Defendant's witnesses testified as to various types of ventilated coated fabrics, such as book cloth covers, label material, fabrics to collect dusts, artificial flowers; and press cloths, which must be porous. Ventilated fabrics could be obtained with coatings up to two and one-half or even three ounces per square yard of material coated; and nonventilated, or impervious fabrics, with as little as one-half ounce per square yard.

The court was particularly impressed with the testimony of defendant's witness, Ayton, who had had over twenty years' experience in the coating field. He introduced in evidence a sample of "press cloth" (with which plaintiff denied any familiarity) used in laundries to cover ironing pads from 1936 to 1955. This press cloth was covered with a very highly heat-resistant coating of about 1.4 square ounces (the upper limit in the present patent specifications and in claim 1, not in suit) to 5 ounces per square yard, and which had to be porous. So prepared, no difficulty with drag was ever presented.

A piece of this cloth (Defendant's Exhibit 9) was offered in evidence. This was attacked by plaintiff's expert (who was also the coater who produced over ninety-nine per cent of plaintiff's coated cloths, for perforation, or under the patent) as being ends of the run, usually cut off and discarded. However, further statements of plaintiff's expert recognized even if such were the case, the practicality and actual use in home ironing, of such material:

---

31. Plaintiff before the Examiner made great capital of the fact that the alleged infringing device cited as a basis for making plaintiff's application special, required a cover over it, while ironing could be done directly on the surface of his cover. (Transcript 412–413). If so, it is difficult to see why there would be infringement.

32. Perhaps over one hundred years old.

"A. * * * This looks to me, and this is just an opinion, like what we would call a head end. That is the part that is sewn to the apron which led the cloth through the coating machine, and therefore did not get a complete coating which was normal in Rev-o-lite operations.

"Q. Could it have been a reject?

"A. At the end of the run these are cut off and thrown away, or the workmen pick them up and made, if they could get them out of the plant, they made covers with them."

Ayton further testified that in 1949 he had had a piece of press cloth made up into a household ironing cover for his home use. It did not fit the board, and he put it in his attic, from which it was brought into court and filed as an exhibit. (Defendant's Exhibit 10).

The further attack on Ayton's testimony is significant. Ayton's company was one of those whom plaintiff approached in 1949–1950 for ironing board (or pad) covers. The argument was and is strenuously pressed that if Ayton (or other coaters or suppliers of coating materials), then knew of a porous coated fabric, they would have disclosed to plaintiff these press cloths, or other ventilated fabrics. The court has carefully reviewed plaintiff's testimony, and finds as a fact that plaintiff did not submit to Ayton or to anyone mentioned in the testimony the abstract problem of supplying a fabric suitable for an ironing pad cover. His inquiries (substantiated by the samples submitted) were either as to whether they could supply (a) a nonpervious coated fabric; or (b) a nonpervious coated fabric similar to a sample submitted; or (c) a nonpervious coated fabric that would not deteriorate when ironing was done directly upon it, and that would not be subject to "drag" (the source or cause of which plaintiff claims he did not then know).

The witness Lacy, called by defendant, was vice-president of the firm that had produced plaintiff's nonpervious covers until this was taken over by another firm in 1952. He testified to having used thermosetting resins in coatings since 1948 or 1949, and to have applied coatings to one side only of the fabric since 1940. Ventilated porous fabrics made by his firm were used in *interlinings* as far back as 1940. Subsequently some were used for "ironing board covers."

The evidence clearly established that porous or ventilated thermosetting fabrics coated on one side only, were known and in use before 1951, and that the technique for making such fabrics was commonly known and practiced in the coating industry. Specifically, the use of such materials for interlinings, one of the specific applications disclosed in plaintiff's application 374,199, was established. As neither claim 2 or 4 of the patent in suit is limited to ironing pad covers, the testimony and exhibits clearly show that the alleged invention was without novelty in the then state of the art.

Available also as representative of the state of the art (see footnote 22, supra) is Holroyd, No. 2,534,818, issued December 19, 1950, on application filed January 18, 1949, on "Finishing Treatment for Asbestos Ironing Roll Covers". The invention relates to a finishing treatment for woven asbestos fabric to condition it for use to cover the rolls of flatwork ironers in commercial laundries. The fabric then used on pads covering the rolls came into direct contact with the goods being ironed, and left "the impression of its weave on the ironed goods." The specifications state:

"The requirements of the finishing treatment imparted to the asbestos fabric are exacting, in that such treatment should serve to lay or anchor the fibers of the asbestos yarns forming the fabric, and should impart a smooth outer surface to the fabric without closing the apertures of the weave, so that the fabric will remain porous."

Then follows the disclosure that the pad cover should be pervious to steam and moisture for better ironing:

" * * * The resinous treatment of the present invention *does*

*not fill in the interstices* of the fabric, and this is desirable, *since better ironing results are secured if the covering fabric is pervious to steam and moisture.*" (Emphasis supplied).

Accordingly, even as applied to ironing pad covers (although the patent, unfortunately, perhaps, is not so limited) one skilled in the art would have known by December 19, 1950, if not earlier, that in ironing pad covers it was desirable to impart a smooth outer surface to the fabric without closing the apertures of the weave. In this way embossing would be avoided, and the better ironing results through perviousness of the fabric to steam and moisture would be achieved. The elimination of embossing was the first alleged advance of Glatt over his patent No. 2,570,110 (in which, however, he had represented that steam discharge was accomplished and ironing done "without any embossing effect on the material ironed"); the elimination of "drag" through the venting of steam was the second. Holroyd clearly and simply showed that the art was cognizant of each, and of means for their elimination.

Therefore, apart from cited patent disclosures, the court finds as a fact and concludes as a matter of law, that claims 2 and 4 of the patent in suit are invalid in view of the state of the prior art.

### Was Glatt the True Inventor of the Patent in Issue?

Plaintiff's testimony as to what he requested Jewel Sheen Coating Company to do, that resulted in the development of the patented product, varied materially during the trial.[33] Plaintiff did not claim to have given the coater any formulations. "I told them what I wanted to do, and they did not seem to have any problem of being able to do it. * * *

I told them the way I wanted it, was actually a scraping action of the cloth, that the plastic is applied right into the interstices. * * * When I told them what I wanted to accomplish in this fabric they did not seem to have any problems doing it."[34] "If you tell him what you want, the results you want, and what you want to obtain out of it, he can do it."[35]

In response to the questions as to just what plaintiff had told the coater, plaintiff replied:

"Well, actually the way it came about was that Jewel Sheen was coating for us another type of fabric, which we mechanically perforated and when we came to this development of semi-porous material, I told them that I wanted substantially the same type of material that we were currently receiving from them, and that particular material was heat reflective and was thermosetting and heat-stable."[36]

"The point I was trying to get across, Mr. Seidman, is that the material we were receiving from Jewel Sheen at that time, we were mechanically perforating in 1950, and it had heat-reflective properties. It had aluminum in there at that time. When we began working on that porous material—in other words, where the other material was relatively a regular coating, I told them I just wanted to scrape the coating into the interstices and leave pinpoint openings. In other words, not entirely fill the interstices, and that material that we were using at that time, before we got into this development had aluminum powder and had heat-reflective qualities."[37]

* * * * * *

"I told them that I wanted a heat-reflective, heat-stable coating, and

---

33. The variation was not so much between direct and cross-examination. It seemed dependent upon plaintiff's interpretation of whether the question related to the part played by Jewel Sheen, or as to what plaintiff told that company.

34. Transcript 73.

35. Transcript 467.

36. Transcript 87–A.

37. Transcript 88.

that was smooth, on which ironing could be done directly thereon; but I wanted the plastic scraped over the surface, mainly into the interstices, but I did not want the interstices filled but I wanted to retain enough open area at the interstices to allow the passage of liquid water and also to allow the penetration of steam, and I wanted the coating on one side only.

"Q. Did you tell them what type of resin to employ? A. I told them to employ resins that were heat-stable at ironing temperatures.

"Q. Did you give them any actual resin? A. Jewel Sheen at that time was supplying me with a solid type of coating, and which was mechanically perforated, and was basically a similar material, which I was desirous of at that time of putting on the ironing surface of a new material, which I asked them about." [38]

Plaintiff's expert, vice-president of the coating company used by plaintiff, when asked if plaintiff had told him how to apply the coating replied:

"Beyond describing that he wanted the surface scraped, and still be kept scorch-resistant, and the material scraped into the interstices, he assumed that I was familiar with the art and I would do what he wanted me to do." [39]

The court was a little dubious that plaintiff, technically untrained, and claiming in his original application in this case that roller printing or knife coating could be used, should have used terms of art in addressing an expert coater. The following then occurred between the court and the coater:

"The Court: Let me interrupt you there, Mr. Cooper. The thing that I want to be sure about is that Mr. Glatt did come to you and said he wanted the materials scraped into the interstices. Now, I ask you, not meaning that you are not testifying entirely according to your recollection, but are you sure of it? The reason I ask is it seems a little odd to me that somebody should tell an experienced knife-coater how to use—how he is to do something.

"The Witness: In reconstructing what happened at that time, I would say that Mr. Glatt's words probably were I don't want the cloth entirely filled up." [40]

At the best, plaintiff claims to have told the coater two things: (a) to use substantially the same type of plastic then used on the covers which were to be mechanically perforated; and (b) to scrape the coating into the interstices, so as to leave pinpoint openings; and "not entirely fill the interstices." [41] Neither of these alleged precepts was followed by the coater.

(a) The coater testified [42] that the qualities of the coating for the cloth to be perforated, and for the cloth to the patent in suit, "had to be different." In the former, a very soft coat was first applied to affect the fibers, and then a very hard material to present a dry surface. In the cloth for the patent in suit, a single coat "which is a compromise between the softness and the dryness" is used.

(b) In the coating, the coater further testified, "the *interstices are completely filled.* There is no pushing aside. It is in the drying that the film fails and falls back into the vent." [43] The coating used

---

38. Transcript 446–447.

39. Transcript VI, 228. A new reporter took the proceedings on the fifth and sixth days, beginning his transcript with page one. The instant citation therefore refers to page 228 of Volume VI.

40. Transcript VI, 229.

41. The following discussion as to not completely filling the interstices is also important on the question of definiteness in the claims.

42. Transcript VI, 146–147.

43. Transcript VI, 238. Emphasis supplied.

is a "poor film former. In drying the film has very low surface tension, and pulls back into the threads, it pulls back in the interstices so that all of the interstices has [sic] some degree of vent. It is a completely porous material."[44]

Under these circumstances, the references by plaintiff's counsel to the "cooperative effort" between plaintiff and the coater[45], and the cloth that the coater finally developed with plaintiff[46] over emphasize plaintiff's participation. It is not merely a question of joint invention, in which event at least an opportunity would be allowed to add the joint-inventor, and such non-joinder would not of itself invalidate the patent, under section 256 of Title 35, United States Code, providing that:

"Whenever a patent is issued and it appears that a person was a joint inventor, but was omitted by error and without deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate adding his name to the patent as a joint inventor.

"The misjoinder or nonjoinder of joint inventors shall not invalidate a patent, if such error can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly."

Nor was Jewel Sheen (or Cooper) merely an assistant or helper (Becton-Dickinson & Co. v. Robert P. Scherer Corp., D.C.Mich.1952, 106 F.Supp. 665, 672). As indicated above, they did not follow Glatt's instructions either as to the type of coating, or manner of application. Furthermore, they "screened" the samples before submitting them to Glatt, eliminating those "so insufficiently coated as to show scorching in our test, or where the sample was coated in such a degree that we could see lack of porosity by holding it to the light. * * * "[47]

The court therefore finds and concludes that even in the field of ironing pad covers (to which the patent is not limited) Glatt was not a sole or co-inventor.

### Indefiniteness of Claims 2 and 4.

Defendant contends that claims 2 and 4 are indefinite and do not distinctly point out the invention, in the following respects:

(a) The preamble of claim 2, incorporated by reference in claim 4, calls for a "ventilated cloth of * * * heat reflectivity", but (says defendant): "There is nothing in these claims which would indicate that the structure has any reflectivity." However, the claim does call for a "heat reflective * * * coating", so that defendant's contention is not literally correct. If defendant means that the patent does not teach what plaintiff meant by "heat reflective", the contention is equally lacking in substance. The specifications[48] state that the coating material consists of a hardenable plastic base "and a reflective pigment incorporated therewith." Admittedly aluminum powder is a reflective pigment, and both of the examples of a suitable coating composition contain a pigment described as aluminum powder.

(b) Claim 2 calls for a "sheet of closely woven textile." The specifications state[49] that in the case of ironing pad covers, weaves of 84 x 28 and 78 x 32 are suitable, but it is not desirable to go below 42 x 14. While the testimony indicated that "closely woven" would, abstractly, be vague and indefinite, the court sees no reason why an inventor may not be his own lexicographer if he ade-

---

44. Transcript VI, 153.

45. Transcript 461; 465.

46. Transcript VI, 156.

47. Transcript VI, 147.

48. Column 2, lines 42–44.

49. Column 6, lines 8–12.

quately discloses his definition;[50] and here plaintiff has adequately defined what, for the purposes of his claims, he considers to be a closely woven textile.

(c) Claim 2 calls for a "non-penetrating * * * coating." The specifications, however, teach[51] a coating producing a cloth "in which the high points 5[52] of the surface comprise mainly *impregnated* threads over which very little excess plastic is deposited, the excess being pushed into the low spots 11 and interstices 4 which are, generally, not completely filled with solid plastic, but are only partially filled." (Emphasis supplied). In view of the strong contentions in the Patent Office that much of the prior art was distinguishable because it involved impregnation, plaintiff's reference to "impregnated threads" is at the best, inept,[53] and at the worst, misleading. Obviously, the word "coated" would have been more appropriate.[54] But it is clear that Glatt was primarily concerned with not penetrating the entire cloth, and that the application of a coating of proper viscosity would not, and does not, penetrate the entire cloth. While there is error in the disclosures, the court does not consider it to be sufficiently serious, in and of itself, to invalidate the claims.

(d) Claim 2 calls for an "organic thermosetting resin coating * * *" While Example 2 in the specifications would meet this requirement, Example 1 was admittedly thermoplastic rather than thermosetting. The recommended addition of a "light coating of a silicone polymer"[55] to the coated cloths would tend to prevent the iron from sticking, and reduce the probability of plasticity quickly developing in the use of a coating prepared in accordance with the formula in Example 1.

The court is concerned by the representation that either formula is a "suitable composition for giving a plastic film stable at temperatures of 600° F. or even 650° F. for short periods of time encountered in ironing."[56] Plaintiff's expert testified[57] that cloth prepared according to Example 1 definitely would not be satisfactory ironing board material in the upper range of temperatures, not for lack of stability, but because it would mark off.

As, however, thermosetting resins were well known, the court is of the opinion that the error in classifying the composition in Example 1 as stable at ironing temperature is not sufficiently misleading to invalidate the claims.

(e) Claim 2 also calls for the coating to be "applied by knife coating substantially uniformly on the top surface only thereof in an amount of about 0.3 to about 1.2 ounces of dry solids per square yard of cloth surface, deposited mainly in the interstices between the weaves of the textile but insufficiently deposited to completely fill said interstices, thereby forming small vent openings in said resin coating in said interstices."

Defendant contends that there is "nothing in the disclosure to correlate the reference to the amount of the resin coating on the one hand and the insufficient deposit of such coating to leave [close?] the vent openings in the coating."

While the objection has some substance, since neither the claims nor the specifications suggest the proper resolution of relevant factors such as absorptive qualities of the cloth, viscosity and pressure, the evidence satisfies the court that a skilled coater, told to apply a "thin, semi-porous, heat reflective, solid, hard-when-dry, non-penetrating,

---

50. See Lincoln Stores v. Nashua Manufacturing Co., 1 Cir., 1946, 157 F.2d 154, 158, certiorari denied, 1947, 329 U.S. 811, 67 S.Ct. 623, 91 L.Ed. 692.

51. Column 1, line 77—Column 2, line 5.

52. Shown of Figures 1 and 2.

53. And further indicative of plaintiff's lack of inventiveness.

54. Transcript VI, 192–193.

55. Column 4, line 27.

56. Column 3, lines 20–22.

57. Transcript VI, 182.

organic thermosetting resin coating," by knife, within the range of 0.3–1.2 ounces of dry solids per square yard of cloth, so as to coat the surface, but end up with a porous cloth, could if left to his own devices as to formula and application and subsequent treatment, such as calendering and drying, produce such a cloth.

The more important objection to this portion of the claims seems, however, to the court to be that the normal construction of the language that the coating is "deposited mainly in the interstices between the weaves of the textile but insufficiently deposited to completely fill said interstices, thereby forming small vent openings in said resin coating in said interstices", particularly in the light of the teachings of the specifications that in the coating the excess plastic is pushed into the low spots and interstices "which are, generally, not completely filled with solid plastic but are only partially filled" (and see Figures 1 and 2 of the Patent)—would be that the claim related to a coated cloth in which, in the original application of the plastic by knife, the resin did not *then* completely fill "said interstices", thereby *then* forming small vent openings in "said interstices." However, when cloth is coated in accordance with the teachings of the Glatt patent, the interstices, as plaintiff's coater testified, "are completely filled. There is no pushing aside. It is in the drying that the film fails and falls back into the vent." Although later testifying that all the interstices had some degree of vent, the coater had previously admitted that in the final product some of the interstices are closed, although "this is not the idea of the production." [58]

This portion of the claim is therefore so indefinite that the court would be strongly inclined to hold the claim invalid, were it not for the testimony of plaintiff's coater that he would regard the questioned language as "an indication of the amount of porosity desired by the inventor" and that it "would be a guide to the coater as to what type of porosity Mr. Glatt has in mind." [59] Since the description of the invention is addressed to one skilled in the art, rather than to laymen, Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 65–66, 43 S.Ct. 322, 67 L.Ed. 523; Ingersoll Milling Machine Co. v. General Motors Corp., D.C.Ill.1952, 110 F.Supp. 12, 31, 40, affirmed 7 Cir., 1953, 207 F.2d 42, the court reluctantly must accept this portion of the claim as sufficiently definite.

The court therefore concludes that the defense that claims 2 and 4 are void for indefiniteness has not been sustained.

**Failure of Specification to Distinctly Set Forth the Invention; Criticality of Values; Scope of Claims as Broader than the Disclosure.**

These remaining contentions cover little if any ground not already traversed in this opinion, and call for very little additional consideration.

Defendant's point that the specification does not distinctly set forth the alleged invention is primarily used as a vehicle for again contending, in slightly different manner, that no invention is disclosed. Defendant contends that plaintiff's previous Patent [60] No. 2,570,-110 showed a fabric coated on one side only, and perforated for venting. The present patent, discussed by plaintiff only as it applies to ironing pad covers, changes only the manner by which porosity is obtained; and this by resort to conventional and well known fabric coating procedures, clearly shown by the prior art patents, and by testimony of the trade. Further, although the coating should be thermosetting, Example 1 is devoid of any thermosetting modifier, without which the coated fabric would not be acceptable, unless silicone were added, but the claims do not mention

58. Transcript 115–116.
59. Transcript 181–182.

60. Compare, Application of Ruff, Cust. & Pat.App.1958, 256 F.2d 590, 598.

silicone.[61] Finally, it is contended that there is no unequivocal explanation of how the plastic can be applied by knife blade, and yet leave small vent openings in the coated material.

On criticality, defendant contends that the range of about 0.3 to about 1.2 ounces of dry solids per square yard is not a critical one, but only a preferred one, which is not susceptible of patent monopoly. Libbey-Owens-Ford Glass Co. v. Celanese Corporation, 6 Cir., 1943, 135 F.2d 138, 145. In the field of ironing pad covers there is some support for this contention, at least in the upper range, since claim 1 (although not in suit) embodies the range 0.3 to 1.4; plaintiff testified simply that "when you get over 1.2, we start losing porosity"[62]; and his coater said that coating outside the range of the patent could still be porous[63], but that "as you get above 1.4 ounces of coating its desirability as an ironing board [sic] cover falls off."[64] Were the claims limited to ironing pad covers this would probably be sufficient. The claims are not so limited, but no evidence of criticality vel non in other applications was offered by either side.

Finally, as to the contention that the scope of the claims is broader than the disclosure, defendant points out that the patent describes coated fabrics "particularly useful in the production of ironing pad covers, interliners for garments, and other articles",[65] and states that in the case of interliners, it is not necessary to employ a heat-resistant plastic for the coating[66]; but the patent was explained, and the prior art attempted to be distinguished,[67] solely in terms peculiar to ironing pad covers.

While there is an element of merit in all the contentions raised under the last three defenses just discussed, the court does not consider any of these three, or all three together, quite sufficient to invalidate the patent. They do, however, tend to support the other grounds on which invalidity has been found.

### Infringement.

If claims 2 and 4 were valid, the accused cover would clearly infringe. A report[68] by United States Testing Company, Inc. showed that the coating of that cover contained a heat reflective pigment consisting primarily of aluminum and magnesium, on a cotton drill closely woven; the coating was thin, porous, dry, hard, and deposited uniformly on the surface but in greater degree in the interstices, and without penetration through the fabric base; that there were pin point openings all located in the interstices; and that the coating was stable to temperatures up to 500° F. Other testimony fixed the weight of the dry solids at 0.89 ounces per square yard.[69]

61. In Application 302,947, of which the application on which the patent in suit issued was a continuation-in-part, the Examiner concluded:
"Claim 10 is rejected as unpatentable over the allowed claims of applicant's application, noted above, especially in view of Swiss, Underwood and Rand. Each of the secondary references disclose a textile base coated with a silicone resin to impart heat resistant characteristics thereto. Overcoating the coated fabric of applicant's claims with a silicone resin would not amount to invention since no new nor unexpected results are produced thereby."

62. Transcript 92.

63. Transcript VI, 165.

64. Transcript VI, 211.

65. Column 1, lines 15–18.

66. Column 5, lines 56–58.

67. Plaintiff's coater was examined at length by plaintiff's counsel on the prior patents relied upon by defendant. In each case he either volunteered the opinion, or in response to a question stated, that the article therein claimed would not be suitable for ironing pad (occasionally "ironing board") covers.

68. October 16, 1957, Plaintiff's Exhibit 16.

69. The court has not overlooked the weight to be given imitation, Otto v. Koppers Company, 4 Cir., 1957, 246 F. 2d 789, 800, but does not consider the question of validity sufficiently close to be influenced significantly by imitation.

### Conclusion.

Claims 2 and 4 of Patent No. 2,704,730 are invalid; but if valid, would be infringed; and the complaint must be dismissed.

The foregoing opinion embodies those findings of fact and conclusions of law deemed necessary by the court for the disposition of the case. Fed.Rules Civ. Proc. rule 52, 28 U.S.C. Counsel may, if they desire, submit requests for further, or more specific, findings.

An appropriate judgment will be entered upon submission.