**BUILDEX INCORPORATED, Plaintiff,**

v.

**KASON INDUSTRIES, INC., Defendant.**

No. CV 82–1418.

United States District Court,
E.D. New York.

May 27, 1987.
On Motion for Relief from Judgment,
June 30, 1987.

Mark H. Sparrow, Jacobs & Jacobs, P.C., New York City, for plaintiff.

Paul J. Sutton, Sutton & Magidoff, New York City (Anthony Amaral, Jr., Esq., of counsel); for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This patent infringement case was tried without a jury in this court, which has exclusive original jurisdiction over patent cases under 28 U.S.C. § 1338(a). Venue is proper under *id.* § 1400(b).

Plaintiff Buildex Incorporated ("Buildex") is a Delaware corporation with its principal place of business in this district. Defendant Kason Industries, Inc. ("Kason") is a New York corporation with its principal place of business in Shenandoah, Georgia. The Standard-Keil Hardware Manufacturing Co. Division ("S–K") is an unincorporated division of Buildex. S–K manufactures and sells hardware components for the food service industry. Traulsen & Co., Inc. ("Traulsen") manufactures reach-in refrigerators used in the food service industry and is a leading customer of S–K.

Buildex contends that Kason has infringed claims 1 through 11 of U.S. Letters Patent No. 4,150,265 ("the suit patent" or "the '265 patent"). This patent, for a hinge-activated switch, is in the name of Dermot Holden, who was employed by S–K from 1975 to 1977. He assigned the '265 patent to Buildex. The application for the suit patent was filed on March 14, 1977 and the patent was issued on April 17, 1979.

Buildex manufactures and sells to Traulsen hinges designated 2850T. Buildex contends that Kason hinge 1263 infringes the '265 patent, which covers the 2850T.

Kason answers that its 1263 hinge (which is also called the 1267, after a notation that appears on the casing) does not infringe the patent. In addition, Kason counterclaims, on a variety of grounds, for a declaration that the '265 patent is invalid. Kason has voluntarily dismissed a second counterclaim charging Buildex and Instrument Systems Corporation with violating the antitrust laws. *See* Fed.R.Civ.P. 41(a)(1)(i).

With respect to Kason's counterclaim attacking the validity of the suit patent, the relevant statute, 35 U.S.C. § 282, requires the court to presume that the patent is valid. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed.Cir. 1983); *accord, e.g., Foseco International Ltd. v. Fireline Inc.*, 607 F.Supp. 1537, 1549 (N.D.Ohio 1984). Kason's attack on the validity of the '265 patent requires "clear and convincing evidence or its equivalent, by whatever form of words it may be expressed." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *accord, e.g., Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed.Cir.1985); *see generally Carlisle Corp. v. Hayes*, 635 F.Supp. 962, 965 (S.D.Cal.1986) (strong presumption patent is valid). Of course, in the event the court finds that Kason has not carried its burden of showing invalidity, it is not necessary to hold the '265 patent valid, since the court's holding would be based only on the record before it. *See Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699 n. 9 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

The situation is somewhat different with respect to Kason's defense that its 1263 hinge does not infringe the suit patent. Buildex has the burden of proving Kason's infringement by a preponderance of the evidence. *See Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed. Cir.1983). The patent holder has the burden of proving infringement whether it relies on a theory of literal infringement, *see Texas Instruments, Inc. v. United States*

*International Trade Commission,* 805 F.2d 1558, 1562 (Fed.Cir.1986), or under the doctrine of equivalents, *see id.* at 1571.

■ The court turns first to the issue of infringement and determines that Buildex has carried its burden of demonstrating that Kason's 1263 hinge infringes the '265 patent. Although Kason has stipulated that all the elements of the 1263 hinge are recited in the '265 patent, it argues that its hinges as sold do not comprise the operable assembly of the whole combination recited in the claims of that patent. Specifically, Kason argues that its hinges do not include a door, a door frame, a fixed member mounted to the door frame, a pivotable member mounted to the door, or—in the case of the 1267 hinge—switch means or switch actuating means.

Kason's argument is unpersuasive. Buildex's 2850T hinge and Kason's 1263 hinge may be used only to mount a door on a door frame. Buildex sells the 2850T exclusively to Traulsen for use on refrigerator doors. Kason sells the 1263 for use on refrigerator doors. That Kason's hinges do not include all the objects depicted in the '265 patent is immaterial, because the door, door frame, and other objects to which Kason refers are not elements of the '265 patent. *See Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 257 (Fed.Cir.1985) (literal infringement requires that accused device embody every element of the claim, without requiring slavish conformity to words of insignificance); *cf. Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985) (to show infringement, plaintiff must demonstrate presence of every element of claim, or its substantial equivalent, in accused device); *Interdent Corp. v. United States,* 531 F.2d 547, 552 (Ct.Cl.1976) (same).

There is no serious question that Kason's 1263 hinge is the device depicted in the '265 patent. If the '265 patent is not proven invalid by Kason, then Kason will have infringed the patent and induced its infringement within the meaning of 35 U.S.C. § 271(b). The court turns to Kason's counterclaim attacking the validity of the suit patent.

The invention embodied in the '265 patent stems from a problem that Traulsen was having with its refrigerators. Before 1976, Traulsen used standard cam-lift hinges in its refrigerators. These served to hold the door open and to provide for self-closing, depending on how they were used. To operate the refrigerator's light, Traulsen used a separate push-button rocker light switch. The problem was that the button of the light switch was exposed, which led, on occasion, to its being broken or to damage to food stored in the refrigerator. Because of the danger that food would become contaminated, the Food and Drug Administration complained about the separate rocker light switch.

In 1975, Erich Maier, Traulsen's Vice President of Manufacturing, met with three employees of Buildex's S–K Division: Dermot Holden, the Director of Engineering; Frank Loikitz, the Manager of Product Development; and Fred Weinmann, the Vice President of Operations. The dies that Traulsen had been using for their conventional cam-lift hinges had worn out, and the participants in the meeting explored the possibility that Traulsen would be interested in buying S–K's standard cam-lift hinges.

During the meeting, Maier raised the problem that Traulsen was having with the separate rocker light switch and asked S–K's representatives whether it would be possible to incorporate the light switch into the cam-lift hinge. Holden and S–K's engineers worked on the problem and came up with the hinge described in the '265 patent.

The parties differ on where the initiative lay. Kason contends that Holden, named as inventor on the '265 patent, is not the true inventor, but that Maier of Traulsen was. According to Kason, Maier had worked on the hinge problem himself before approaching S–K. Kason relies on Maier's deposition testimony—Maier died before trial—to prove that he showed a working model of his proposed hinge to S–K's employees, that he instructed S–K with specifications of what Traulsen want-

ed, that S–K's employees had not realized (until Maier told them) it was possible to incorporate a light switch into a cam-lift hinge, and that Maier demanded on behalf of Traulsen exclusive rights to buy the hinge so that his employer would benefit from his discovery. Of course, "[a] person shall be entitled to a patent unless ... he did not himself invent the subject matter sought to be patented...." 35 U.S.C. § 102(f). Thus, if Kason is correct about Maier's role, Holden was not the true inventor of the hinge depicted in the suit patent, and that patent is invalid.

Buildex takes an entirely different view of Maier's role. It maintains that Maier's testimony is, for a variety of reasons, unworthy of belief and that he did no more than ask S–K to find a way to incorporate the light switch into the cam-lift hinge. Buildex argues that Holden actually conceived and built an experimental prototype of the invention embodied in the '265 patent, and that Maier is at most a joint inventor.

█ Under 35 U.S.C. § 256, failure to name a joint inventor in a patent, provided there is no deceptive intention, may be corrected without invalidating the patent. See *Glatt v. G.C. Murphy Co.*, 168 F.Supp. 50, 68 (D.Md.1958), *aff'd*, 270 F.2d 137 (4th Cir.1959). Initially, however, Kason has the burden of showing non-joinder of an inventor by clear and convincing evidence. *Indecor, Inc. v. Fox–Wells & Co.*, 642 F.Supp. 1473, 1490 (S.D.N.Y.1986).

█ The court finds that Kason has failed to carry that burden in its attempt to prove that Maier was the true inventor. Although Maier's death before trial deprived the court of an opportunity to assess his demeanor, a reading of his deposition suffices to demonstrate that his testimony cannot provide clear and convincing evidence regarding the identity of the inventor. For instance, Holden, Loikitz, and Weinmann all testified that their first meeting with Maier took place at Traulsen. Maier testified that the meeting was at S–K. Standing alone, this disagreement might not go far toward impeaching Maier, since those who disagreed with his version were all S–K employees. But Maier also testified that he had dealt with S–K's Holden in 1973 and 1974, when, in fact, Holden did not join S–K until 1975.

Balancing Maier's testimony against that of Holden and other S–K employees—to the effect that Holden and S–K engineers worked on the light switch problem and solved it themselves—the court cannot conclude that there is clear and convincing evidence negating the presumption that Holden was the actual inventor. While Buildex acknowledges that it would not have solved the light switch problem if Maier had not raised the problem first, this scenario is still consistent with the notion that Holden was the real inventor. It is one thing to suggest that a better mousetrap ought to be built; it is another thing to build it.

Kason's next argument is that, even (perhaps especially) if Holden is the real inventor, the patent is invalid because the hinge was on sale in the United States for more than one year before the patent application was filed. *See* 35 U.S.C. § 102(b). To sustain this argument, Kason must present clear and convincing evidence. *E.g., Red Cross Manufacturing Corp. v. Toro Sales Co.*, 525 F.2d 1135, 1139–40 (7th Cir.1975); *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 639 F.Supp. 937, 940 (E.D.Tenn. 1986).

A classic formulation of section 102(b)'s "on sale" bar appears in *Timely Products Corp. v. Arron*, 523 F.2d 288, 302 (2d Cir. 1975) (Conner, J.) (citations omitted):

Section 102(b) bars an application for patent filed more than one year after the solicitation of an order for a specific article to be produced later, where the following requisites are present:

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable.

(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice.

(3) Finally, the sale must be primarily for profit rather than for experimental purposes.

Now that the Court of Appeals for the Federal Circuit has exclusive jurisdiction of appeals in patent cases, 28 U.S.C. § 1295(a)(1), its precedents are binding in this action. The Federal Circuit recently diverged from *Timely Products* by "conclud[ing] that reduction to practice of the claimed invention has not been and should not be made an absolute requirement of the on-sale bar." *UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir. 1987). The court added that reduction to practice remains "an important analytical tool in an on-sale analysis," but that it is necessary to consider "[a]ll of the circumstances surrounding the sale or offer to sell ...," *id.* at 656.

■ The application for the suit patent was filed on March 14, 1977, so the key date for analysis is March 14, 1976. Kason's theory is as follows: Holden showed representatives of Traulsen a working model of the hinge in October 1975; the Traulsen representatives approved of it; on October 21, 1975, Ed Czerniawski of Traulsen negotiated with a representative of S–K to discuss the terms on which S–K would sell the hinge to Traulsen; and, on or about November 3, 1975, S–K's Sales Manager, Irving Brown, sent Czerniawski a "quotation" offering the hinge of the '265 patent for sale.

In contrast, Buildex argues that (1) there is no proof that either of the two extant versions of the Brown quotation was ever sent to or received by Traulsen before March 14, 1976 and that the mere existence of a sales contract does not mean the hinge was on sale, and (2) although Maier was not an inventor of the hinge, his company, Traulsen, was part of an "inventorship entity" with S–K, and agreements between joint developers do not constitute a sale or offer for sale.

The court finds that Kason has failed to demonstrate by clear and convincing evidence that the hinge was on sale before March 14, 1976. The court does not give much weight to the Brown quotation because there is no testimony that it had been received by Traulsen before March 14, 1976 and no testimony as to when S–K began to ship the hinge with the switching feature to Traulsen. In short, the available and credible evidence about the Brown quotation and the course of dealings between S–K and Traulsen fails to provide clear and convincing proof that S–K offered the hinge for sale before March 14, 1976. In light of this conclusion, the on sale bar cannot operate, and it is unnecessary for the court to consider Buildex's alternative theory of joint development.

The next theory of Kason's counterclaim is that the suit patent is invalid because its subject matter was obvious. The relevant statute provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

35 U.S.C. § 103.

The Federal Circuit has reiterated:

Though the ultimate question is one of law, a determination of obviousness un-

der section 103 is based on these factual inquiries set forth in *Graham v. John Deere Co.* [, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) ]: (a) the scope and content of the prior art; (b) the differences between the prior art and the claims at issue; (c) the level of ordinary skill in the art; and (d) objective evidence of nonobviousness.

*Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 958 (Fed.Cir. 1986) (footnotes omitted). Upon examining the *Graham* factors, "the district court determines whether the claimed invention would have been obvious to one of ordinary skill in the appropriate art at the time the invention was made." *Id.*

The obviousness inquiry must be made with care, because:

> The issue of obviousness is determined entirely with reference to a *hypothetical* "person having ordinary skill in the art." It is only that hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is irrelevant to the inquiry, and this is for a very important reason. The statutory emphasis is on a person of *ordinary* skill. Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (i.e., inventors) would have known or would likely have done, faced with the revelations of references. A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference.

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985) (emphasis in original); *accord Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed.Cir.1986).

Because section 103 focuses on what would have been obvious "at the time the invention was made," the court "cannot rely on hindsight in determining whether the invention was obvious," *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 625 F.Supp. 343, 348 (E.D.Mich.1985), *aff'd*, 800 F.2d 1101, 1106 (Fed.Cir.1986).

The Federal Circuit has held also:

> That each element in a claimed invention is old or unpatentable does not determine the nonobviousness of the claimed invention as a whole. "There is no basis in the law * * * for treating combinations of old elements differently in determining patentability."

*Customs Accessories, supra*, 807 F.2d at 959 (quoting *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556 (Fed.Cir. 1985)); *see Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed.Cir.1983) (virtually all patents are "combination" patents).

The first *Graham* factor is the scope and content of the prior art. During prosecution of the application for the '265 patent, the Examiner considered eight patents: Close, *et al.*, U.S. Patent No. 3,157,756; Foltz, U.S. Patent No. 3,803,375; Gwozdz, U.S. Patent No. 3,840,715; Loikitz, U.S. Patent No. 4,030,161; Newlon, U.S. Patent No. 4,040,934; Suska, U.S. Patent No. 4,066,857; British Patent No. 1,279,381; and British Patent No. 1,333,034. Kason has listed various other patents that it contends represent prior art.

With respect to the scope and content of prior art, the court credits the testimony of Gordon Dyke, a patent attorney called by Buildex. Dyke testified at some length regarding the eight patents considered by the Examiner and explained how the eleven claims of the '265 patent differed from these eight other patents. Even those patents that were somewhat similar to the suit patent had crucial distinctions. For instance, the Loikitz patent, which had a similar structure to the suit patent, lacked the switching mechanism that was unique to the suit patent. Tr. 200. Similarly, Dyke testified credibly that Berkowitz, U.S. Patent No. 3,748,688 was interchange-

able with Loikitz. Tr. 214. He added that the other patent upon which Kason relied as prior art, Jauch, U.S. Patent No. 2,827,-524, was also cumulative, Tr. 215, and, regarding Berkowitz and Jauch, "[t]hat neither alone nor both together would rebut the presumption of validity, or the presumption of administrative regularity," Tr. 216.

All the patents upon which Kason relies, other than Loikitz and the cumulative Berkowitz patents, concern camlift hinges without switching capability. They lack the dual axial and pivotal motion of the '265 patent. Kason has not demonstrated why it would be "obvious" to combine Jauch with Loikitz or any other patent to achieve the effect of the '265 patent and, the court reiterates, it should not easily be assumed that a "combination" patent is obvious, since almost all patents fit that definition. For the foregoing reasons, the first two *Graham* factors—scope and content of prior art; difference between prior art and claims at issue—weigh in favor of the validity of the '265 patent.

■ The third *Graham* factor is the level of ordinary skill in the art. The Federal Circuit has listed six factors that should be considered in determining the level of ordinary skill: "educational level of the inventor, type of problems encountered in the art, prior art solutions, rapidity of innovation, sophistication of technology, and educational level of active workers in the field." *Bausch & Lomb, supra,* 796 F.2d at 449–50 (citing *Environmental Designs, supra,* 713 F.2d at 696). Kason does not seriously contest Buildex's assertion that the level of skill in the art is low. This renders even minor non-obvious advances in the art patentable.

The fourth *Graham* factor—objective evidence of nonobviousness—often is called the "secondary considerations." *See, e.g., King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 857 (Fed.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). "Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered *before* a conclusion on

obviousness is reached and is not merely 'icing on the cake' ..." *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1380 (Fed.Cir.1986) (emphasis in original); *accord Lyle/Carlstrom Associates, Inc. v. Manhattan Store Interiors, Inc.,* 635 F.Supp. 1371, 1384 (E.D.N.Y.1986).

Here, the '265 patent was commercially successful in that S–K arranged for exclusive sales to Traulsen. While this type of commercial success is not fully equivalent to success in a rough-and-tumble marketplace, it remains probative, because Traulsen brought the problem of the light switch to S–K and was satisfied with S–K's solution to the problem. It is also significant that no one had designed a hinge like the 2850T for many years but that Kason introduced the 1263 shortly after the 2850T appeared. *See Allen Archery, Inc. v. Browning Manufacturing Co.,* 819 F.2d 1087, 1092 (Fed.Cir.1987) (significance of copying); *Dow Chemical Co. v. American Cyanamid Co.,* 816 F.2d 617, 620 (Fed.Cir. 1987) (same); *Akzo N.V. v. U.S. International Trade Commission,* 808 F.2d 1471, 1480 (Fed.Cir.1986) (same); *cf. Panduit Corp. v. Dennison Manufacturing Co.,* 810 F.2d 1561, 1571 (Fed.Cir.1987) (defendant copied inventions).

■ Considering as a whole the invention embodied in the '265 patent, *see W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1548 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984), the court concludes that Kason has not demonstrated obviousness within the meaning of section 103.

■ Kason's counterclaim attacking the validity of the suit patent also alleges that the '265 patent fails to disclose the best method contemplated by the inventor. If so, this would render the patent invalid under 35 U.S.C. § 112. In the words of the Federal Circuit:

The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention. The law recognizes that patent specifications are

written for those *skilled in the art,* and requires only that the inventor describe the "best mode" known at the time to him of making and using the invention. 35 U.S.C. § 112.

*SRI International v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985) (in banc) (emphasis in original; footnote omitted).

The same court has observed:

Because not complying with the best mode requirement [of section 112] amounts to concealing the preferred mode contemplated by the applicant at the time of filing, in order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed.

*Hybritech, supra,* 802 F.2d at 1384–85.

Kason argues that the '265 patent does not disclose Holden's best mode and that the written specification failed to identify the precise angle of the taper on the pin. Neither argument persuades the court. As to the first argument, Holden invented only one mode, which is now embodied in both the 2850T and the 1263 hinges. As to the second argument, Dyke testified that the taper angle depicted in the patent was identical or nearly identical to the angle found on the 2850T hinge, and that a person of ordinary skill in the art could have made use of the invention based on the patent drawing specification. Tr. 306–07. In sum, the court cannot agree with Kason's contention that the suit patent fails section 112's best mode requirement.

■ Kason's next counterclaim theory is that the '265 patent is invalid because Buildex misused it by arranging for exclusive sales to Traulsen. This purported violation of the antitrust laws must be analyzed under the rule of reason. *See Munters Corp. v. Burgess Industries Inc.,* 450 F.Supp. 1195, 1207 (S.D.N.Y.1977) (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977)). Kason's misuse theory fails because (1) there is no evidence that Traulsen accepted the limitation on resale of the 2850T hinge appearing in the quotation discussed earlier and (2) Traulsen is not in the business of selling hinges, but only sells refrigerators with the hinges installed or hinges alone as replacement parts. Thus, even if the court were in a position to find that Traulsen had accepted the limitation on resale, this would not constitute a misuse of the patent by Buildex, under rule of reason analysis.

The final theory of Kason's counterclaim is that the suit patent is invalid because of fraud. "The party asserting fraud assumes a heavy burden." *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1568 (Fed.Cir.1984). Kason must show "clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed. Cir.1983). Kason's theory of fraud is predicated, essentially, on its arguments that the patented item had been on sale for more than one year before filing of a patent application and that Holden was not the real inventor of the hinge. Because the court has found that Kason has failed to demonstrate either of these propositions by clear and convincing evidence, neither proposition can successfully support a claim of fraud.

Having determined that Kason failed to demonstrate the invalidity of the '265 patent and that the 1263 hinge infringed the suit patent, the court turns to the questions of injunction, damages, and attorneys' fees. Courts having jurisdiction of patent cases "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "Although a district court has discretion whether to enter an injunction, the exercise of this discretion cannot be arbitrary." *Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1564 (Fed.Cir.1984) (citation omitted). Thus, "the district court's grant or denial of an injunction is reviewed under an abuse of discretion standard." *Windsurfing International, Inc. v. AMF, Inc.,* 782 F.2d 995, 1002 (Fed.Cir.), *cert. denied,*

— U.S. ——, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

■ Although Buildex's post-trial memorandum of law and proposed findings of fact and conclusions of law do not address the question of an injunction, Buildex did clearly request injunctive relief both before, Tr. 24, and after, Tr. 477, witnesses testified in this action. Inasmuch as the court has found infringement of the '265 patent, an injunction is appropriate. Kason is therefore enjoined from continuing to infringe the '265 patent.

With respect to damages, the relevant statute provides that a successful claimant should receive damages adequate to compensate for infringement, but in no case less than a reasonable royalty for the use made by the infringer. 35 U.S.C. § 284. The statute further provides for interest and costs, as well as the possibility of treble damages. *Id.* Buildex seeks damages based on a 20% royalty, with the actual amount to be determined at an accounting. It also requests trebling of damages. Because the evidence on damages was less comprehensive than the evidence on infringement, the court directs the parties to appear at a status conference, in courtroom 5, on June 9, 1987, at 4:30 p.m. At that time, counsel should be prepared to discuss whether further testimony should be taken on the issue of damages.

The final matter to be resolved is Buildex's request for attorneys' fees under 35 U.S.C. § 285, which provides for awards of "reasonable attorney fees to the prevailing party" in "exceptional cases." Awards under section 285 are committed to the district court's discretion and will not be upset in the absence of an abuse of that discretion. *Korody-Colyer Corp. v. General Motors Corp.*, 760 F.2d 1293, 1295 (Fed.Cir. 1985). The exercise of discretion must be predicated, however, on a preliminary determination that the case is "exceptional" —a determination that, standing alone, would not necessitate an award of attorneys' fees. *See Reactive Metals & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed.Cir.1985).

A case cannot be "exceptional" for purposes of section 285 if "the issues may be fairly described as 'close,'" *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1581 (Fed.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987), and attorneys' fees should not be assessed routinely against losing parties, *Revlon, Inc. v. Carson Products Co.*, 803 F.2d 676, 679 (Fed.Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 671, 93 L.Ed.2d 722 (1986); *cf. TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1061 (Fed.Cir.1986) (declining to award section 285 fees on appeal where losing party raised "colorable, albeit weak, argument").

■ Here, some of Kason's attacks on the validity of the '265 patent—particularly the contentions that Holden was not the true inventor and that the invention had been on sale for more than one year before the patent application was filed—easily satisfied the requirement of colorability and good faith. The court therefore concludes that this is not an "exceptional" case and that an award of attorneys' fees under section 285 is not appropriate. The foregoing constitutes the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

To summarize, the court holds that Kason has not proven the invalidity of the '265 patent, that Kason has infringed and induced infringement of that patent, that Kason is to be enjoined from further infringement of the patent, and that there ought not to be an award of attorneys' fees under 35 U.S.C. § 285. The question of damages will be addressed at a status conference on June 9, 1987 at 4:30 p.m.

SO ORDERED.

## ON MOTION FOR RELIEF FROM JUDGMENT

Defendant Kason moves for reconsideration of the court's findings of fact and conclusions of law, which were embodied in a memorandum and order dated May 27, 1987. The motion for reconsideration will be treated as a motion for relief from judgment, Fed.R.Civ.P. 60(b). In its May 27 opinion, the court held that Kason infringed the so-called '265 patent owned by plain-

tiff Buildex by assignment from Dermot Holden, a former employee of Buildex's Standard-Keil division. Without conceding that the court was correct in rejecting any of its defenses, Kason argues that the court's rejection of its "on-sale" argument, *see* 35 U.S.C. § 102(b), was particularly egregious and should be reversed as a matter of law. Giving full consideration to the documents and deposition testimony that Kason forcibly argues was overlooked or slighted by the court, the court concludes, for the reasons that follow, that Buildex is still entitled to judgment in its favor. The motion for relief from judgment, therefore, is denied.

In the May 27 opinion, the court declined to give much weight to a quotation purportedly sent to Ed Czerniawski of Traulsen by S–K's Sales Manager, Irving Brown. Kason seeks to bolster the effect of that quotation by calling attention to portions of the deposition testimony of Brown and Holden. Among other things, Brown testified:

> [A]fter the engineering people at Traulsen resolved, you know, or concluded what it was that they wanted incorporated in their hinge, we worked up a price and presented a price with Traulsen and we were successful in receiving the order.
>
> \* \* \* \* \* \*
>
> Q. The goal during this period that we're discussing now was, I take it, sales of these hinges by Standard-Keil to Traulsen, am I correct?
> A Exactly.
>
> \* \* \* \* \* \*
>
> Q Was the quotation accepted?
> A Yes.
>
> \* \* \* \* \* \*
>
> Q And I take it the goods were eventually paid for at some point, hopefully?
> A Yes.
>
> \* \* \* \* \* \*
>
> Q Brown Deposition Exhibit No. 2 appears to be a copy of the original quotation forwarded to Traulsen and Company. Do you have any reason today to believe that it is not a true copy?
> A It appears to be a true copy, yes.
>
> \* \* \* \* \* \*
>
> Q Did you have the authority as sales manager for Standard-Keil on or about November 3, 1975 to make quotations of the type of Brown Deposition Exhibit No. 2 and other types of quotations?
> A Yes.

The quotation stated that S–K would offer the unique feature of the hinge it described solely to Traulsen, that Traulsen would pay for the necessary special tooling, that S–K would obtain a patent in the name of Holden (who would assign the patent to S–K), and that Traulsen would agree to use the hinge for its own use exclusively. In relevant part, the quotation provided:

| QUANTITY | DESCRIPTION | PRICE |
|---|---|---|
| 50,000 pcs. | Edgemount self-closing cam lift-off hinge, with special configuration for adapting Traulsen switches. | 2.84 each |

This hinge is drawn and detailed on S–K Drawing No. 2850–1213–2110.

This quotation is based on the following:

1. Standard-Keil agrees that the unique feature of this hinge, namely the switching configuration, will be offered solely to Traulsen.

2. Traulsen agrees to pay for the following special tooling required to produce this unique feature:

   a. Core pulls for recess on bracket die.

   b. Plastic button injection molding die.

NOTE: At this time it appears that the cam required for Traulsen's configuration does not differ from the Standard-Keil cam to be offered to the general trade, except for a secondary operation required by Standard-Keil to adapt the cam for Traulsen. Therefore, there will be no charge to Traulsen for cam tooling.

3. Standard-Keil will obtain a patent for the unique switching feature. The patent will be in the name of Standard-Keil's chief engineer, Dermot Holden, who will assign the patent to Standard-Keil. Standard-Keil will then grant sole right to the use of this patent to Traulsen for the entire time Traulsen is purchasing these hinges from Standard-Keil.

4. Traulsen agrees to use the hinge for its own use exclusively, without selling it or granting sole right to any other firm.

• • •

Delivery can be made 120–160 days after receipt of an order.

Holden testified about how he got the idea for the patented hinge and described his meetings with representatives of Traulsen. At those meetings, he showed prototypes of the hinge to Traulsen. Later, he became aware that S–K sold the product to Traulsen.

If the dealings between S–K and Traulsen, which took place approximately four months before the critical date of March 14, 1976, constitute an offer for sale, then the '265 patent is invalid under 35 U.S.C. § 102(b). The court finds, however, that there was no offer of sale within the meaning of the statute.

It is not disputed that Holden got the idea for the '265 patent from a description by Traulsen of a problem it had been having with its refrigerators. The hinge embodied in the patent would not have been invented by Holden were it not for the impetus to invent it and the emanations in that regard from Traulsen. (*See* Memorandum from Erich Maier to Mr. Traulsen, dated May 21, 1982, attached to defendant's request for reconsideration as DX–F1.) Under these circumstances, and given the language of the Brown quotation, the court would be driven to the conclusion that S–K and Traulsen developed the hinge jointly. The holding in the May 27 memorandum and order that Holden was the legitimate patentee is not inconsistent with this conclusion. Paragraph 3 of the Brown quotation to Traulsen, which Kason contends Traulsen accepted and upon which Kason so heavily relies, explicitly acknowledges that fact.

Preliminarily, it is advisable to consider the policies behind the on-sale bar of section 102(b):

First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity. Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention [patent] rights due to prior sales. A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17–year period. The on-sale bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment. This benefits the public because it tends to minimize the filing of inventions [sic] of only marginal public interest.

*UMC Electronics Co. v. United States*, 816 F.2d 647, 652 (Fed.Cir.1987) (quoting *General Electric Co. v. United States*, 654 F.2d 55, 61 (Ct.Cl.1981)) (brackets added and citations omitted by *UMC*); *see Red Cross Manufacturing Corp. v. Toro Sales Co.*, 525 F.2d 1135, 1139 (7th Cir.1975) (policy is to prevent inventor from holding back secrets of invention while exploiting it commercially and thus extending duration of legal monopoly).

Upon the facts of this case, not one of the policy considerations that section 102(b) was designed to advance is implicated.

(1) The crucial date for the on-sale bar analysis is March 14, 1976. The quotation upon which the on-sale argument is bottomed is dated November 3, 1975, with delivery contemplated to be made, at the earliest, four months thereafter, in March 1976. There has thus been no prolonged sales activity nor can it conceivably be said that an invention to be used exclusively by Traulsen has been removed from the public though the public believed it freely available to all.

(2) The policy favoring prompt and widespread disclosure of new inventions, compelling the inventor to file promptly or risk forfeiture of his patent rights due to *prior sales*, has not been violated, as will be demonstrated hereafter, nor can it be convincingly contended that the patent application was tardy.

(3) The facts will not support the contention that Buildex commercially exploited the exclusivity of the invention beyond the 17-year period. The commercial exploitation of the invention is precluded by Buildex's agreement to grant the sole use of the patent to Traulsen.

(4) The fourth policy consideration, that is, affording the inventor a reasonable time following sales activity to determine whether a patent is a worthwhile investment, thus tending to minimize the filing of inventions of only marginal public interest, is not violated. The quotation itself contemplates obtaining a patent and no suggestion has been made that the invention has only marginal public interest.[1]

■ Because 35 U.S.C. § 282 confers a presumption of validity on patents, a party asserting the on-sale bar must prove his defense by clear and convincing evidence. *Red Cross, supra,* 525 F.2d at 1139. Once that party shows there was an offer of sale, the burden shifts to the patentee to show by clear and convincing evidence that an exception to the on-sale bar applies. *See id.* at 1139–40; *accord Kock v. Quaker Oats Co.,* 681 F.2d 649, 653 (9th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983). In this case, the patentee has carried that burden.

■ One such exception is joint development. The invention is not "on sale" until it is placed on sale to a person "outside the inventorship entity." *General Motors Corp. v. Toyota Motor Co.,* 467 F.Supp. 1142, 1165 (S.D.Ohio 1979), *rev'd in part on other grounds,* 667 F.2d 504 (6th Cir.1981), *cert. denied,* 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982), *aff'd mem. after remand,* 738 F.2d 454 (Fed.Cir. 1984); *see Ex-Cell-O Corp. v. Litton In-*

*dustrial Products, Inc.,* 479 F.Supp. 671, 689–90 (E.D.Mich.1979); *Metallurgical International, Inc. v. Kawecki Berylco Industries, Inc.,* 348 F.Supp. 825, 832 (E.D. Pa.1972).

■ The very quotation that Brown authenticated offers clear and convincing proof that S–K was not offering the hinge to Traulsen for sale in the sense of section 102(b). First, the quotation provided for S–K to sell exclusively to Traulsen and for Traulsen not to resell the hinges. Second, Traulsen agreed to pay for special tooling expenses that S–K would incur. Third, Traulsen understood that S–K would obtain a patent in Holden's name and that Holden would assign the patent to S–K. When the language of the quotation is coupled with the circumstances leading to the invention of the hinge (*see* DX–F1, to which reference has previously been made), there can be no doubt that the relationship between S–K and Traulsen was not the type of transaction contemplated by section 102(b). Quite clearly, Traulsen was not a purchaser "outside the inventorship entity," *General Motors Corp., supra,* 467 F.Supp. at 1165.

This case is remarkably similar to *Ex-Cell-O-Corp., supra,* in which the court held the invention there in dispute was jointly developed. Erich Maier's memorandum of May 21, 1982 (DX–F1 annexed to defendant's request for reconsideration) clearly and convincingly establishes that he and Buildex's employees were involved in the invention from the outset. Maier states:

> I explained and discussed with them my idea to place the light switch into the hinge to be actuated by the up and down movement of the hinge. I gave them hints as to the possible use of a plunger to be used along with a pushbutton

---

1. The court has explicated its view that the policy considerations of section 102(b) have not been offended. A synthesis of the facts will, perhaps, buttress that view. A (Traulsen) presents a problem to B (S–K) for the specific purpose of inviting B to solve the problem for the benefit of A. B solves the problem and thereafter agrees (the Brown quotation) with A that B will obtain a patent in the name of B's engineer (Holden), who will then assign the patent to B. B will then give A the exclusive right to purchase the invention and A agrees to use the invention for its own use without granting or selling its sole right to any other firm. C (Kason, the infringing defendant) now seeks to use the document (the quotation), which contemplates and, indeed, endorses the obtaining of the patent by B as itself being the basis for invalidating the patent. Viewed in that light, it is difficult to believe that these facts give rise to an on-sale bar aimed at by section 102(b).

**1034**

switch which I brought along. They said that although they were not aware of any possibility to do that and they had never heard of placing a switch concealed by the hinge and actuating it by the hinge movement, they would try to follow my guidelines and come up with more mechanical details in the very near future. I told them that if there is any modification to be done to the hinge we would be willing to pay for it, if within reason.

After my visit, they called me several times for more information and several weeks later I went back to Keil to look at and discuss a rough sample which included the switch I left with them which was actuated by the plunger discussed during my first visit.

I also discussed with them the slight change to be made to one cam to be used for left and right hinging, and changing the final door closing position on the cam to make the doors close more tightly.

During the meeting we discussed the possibility of making their hinges as a standard hinge and ours as a special hinge exclusively for Traulsen's use for at least four years.

We at Traulsen discussed the possibility of getting our own patent on that idea but did not pursue the matter.

Traulsen agreed to pay for the tooling required to produce core pulls for recess on bracket dies and plastic button injection molding die (Quotation, para. 2).

Giving full effect to the documents to which Kason continuously and vigorously refers leads to the inescapable conclusion that the transaction between Traulsen and S–K, rather than being the sale of a hinge invented by Holden, constituted the transfer of a hinge developed by both Maier and Holden and built by S–K. *See Ex-Cell-O, supra,* 479 F.Supp. at 690.

In a June 2, 1987 memorandum and order, the court stayed an injunction against further sales by Kason of its infringing cam-lift hinge. The stay shall remain in effect for thirty (30) days from the date of this memorandum and order, to give Kason an opportunity either to agree with Buildex on a bond or other arrangement for a stay pending appeal or to seek a stay pending appeal from the Court of Appeals for the Federal Circuit. The preceding sentence is written with the Federal Rules of Appellate Procedure clearly in mind. *See* Fed.R. App.P. 8(a) (application for stay should ordinarily be made to district court in first instance, unless district court has denied application).

For the foregoing reasons, Kason's motion for relief from judgment is denied.

SO ORDERED.